## Milesky v. Department of Environmental Resources

*Dennis W. Strain,* for Commonwealth.
*Milton D. Rosenberg,* for appellant.

HARNISH, *Member,* August 26, 1981—This matter arises from DER's revocation of appellant's assistant mine foreman's certificate.

## FINDINGS OF FACT

1. Appellant is William V. Milesky. On July 18, 1980, he was an assistant mine foreman, certified by DER and was the night-shift foreman at the Mathies Mine.

2. Appellee is the Commonwealth of Pennsylvania, Department of Environmental Resources (DER), which has the duty and responsibility of administering the Pennsylvania Bituminous Coal Mine Act of July 17, 1961, P.L. 659, 52 P.S. § 701-101 et seq. and which, under authority of said act, revoked appellant's assistant mine foreman's certificate.

3. The Mathies Mine is a gassy, deep bituminous coal mine.

4. On July 18, 1980, Wayne Travika was electrocuted when he came in contact with an energized trolley wire in the Mathies Mine; he died shortly thereafter.

5. The trolley wire in question was located in the area of the back action switch in the West Mains area of the Mathies Mine, by the one south belt starter box. It was a 550 volt DC bare conductor wire.

6. At the site of the electrocution, the trolley wire was 67 inches above the rail of the track. Beneath the wire were a track mounted supply car and locomotive. The end of the supply car was approximately ten feet from an intersection in the outby direction.

7. The end of the trolley wire had been cut close to the end of the supply car. The wire hung 11 inches down from the roof of the mine and 21 inches up from the top of the supply car. At that height, the wire would be close to eye level of a person entering the supply car, and it would be close to the waist of a person stepping into the upper portion of the car. The wire ran generally along the edge of the supply car. There was nothing around the wire to prevent someone from coming into contact with it.

8. To prevent contact with a trolley wire, permanent guards, consisting of wood or plastic flanking the sides of the wire, are sometimes used in the mining industry. Where people are working near a trolley wire for short periods of time, temporary guards are sometimes used. At the Mathies Mine, a plastic device is now used as a temporary guard. Turning off the power and placing a danger tag on the switch is also a temporary safety measure, approvable under section 328 of the act. There was a trolley switch located 90 feet or less from the site of the electrocution in the outby direction.

9. At the beginning of the midnight shift on July 18, 1980, William Milesky was advised that two persons from the prior shift, Rod North and William

Koday, were supporting some bad roof near the one south belt starter box. He directed Wayne Travika and Angelo Sabatini to obtain a supply car filled with cribbing blocks, so that they could relieve North and Koday and continue the work of supporting the roof.

10. William Milesky directed Daniel Bennett, section foreman of the West Mains, to see that the trolley switch was off, to check the roof, and to cut the trolley wire if necessary. Mr. Bennett examined the area and directed his mechanic to turn off the trolley switch, put a danger tag on it, and then cut the trolley wire. Approximately one hour later, Mr. Bennett checked the trolley switch and saw that his instruction had been followed. This occurred before Wayne Travika and Angelo Sabatini arrived.

11. William Milesky arrived at the West Mains back action switch (before Wayne Travika and Angelo Sabatini) at approximately 3:00 a.m. He inspected the trolley switch and the place at which the trolley wire had been cut and noted that the trolley power switch had been turned off and tagged. At this time, Rod North and William Koday were working near the one south belt starter box, using their own supply car parked near the intersection. Mr. Milesky discussed roof support with Travika and Sabatini, but left while North and Koday were still present.

12. To comply with Mr. Milesky's instructions, it was necessary for Angelo Sabatini to turn on the trolley switch so that Rod North and William Koday could remove their supply car, and so that Sabatini and Travika could place their car near the intersection. Mr. Milesky was aware that this would have to be done and that the power would have to be turned on to do so, he was also aware that the switch had been tagged and that Sabatini and

Travika had been instructed at weekly safety meetings to cut off the trolley switch.

13. Angelo Sabatini turned on the power in order to bring his supply car into place and kept the power on to maintain radio communication.

14. To comply with Mr. Milesky's instructions, it was necessary for Angelo Sabatini and Wayne Travika to unload their supply car, Mr. Milesky was aware that this would have to be done. In order to unload the supply car, it was necessary to climb inside it. Wayne Travika and Angelo Sabatini had occasion to enter the supply car to unload it.

15. William Milesky returned to the site with Mr. William Hamilton at approximately 6:00 a.m. At that time, Angelo Sabatini and Wayne Travika were working on their last crib. Mr. Milesky stayed with Hamilton, Sabatini, and Travika for 15 to 20 minutes. During this time, he spoke to no one about the trolley wire; he assumed that Travika and Sabatini had followed the general rule regarding a tagged safety switch and their specific instructions at safety meetings.

16. The general rule regarding a tagged safety switch is to check to see that no one is in danger before turning it on. General instructions on working with electrical equipment were given to Wayne Travika and Sabatini during weekly safety talks given on June 9, 1980 and May 5, 1980, and Mr. Sabatini admitted that he knew that he was supposed to turn the power off.

17. The locomotive motor radio and light were off at 6:00 a.m.; there was no visual indication that the trolley wire was energized.

## DISCUSSION

Since the instant matter has resulted in the tragic loss of a human life and since it imperils the

professional status of appellant, it is not surprising that the parties have couched their sharp disagreement in strong rhetoric. Nevertheless, there is very little disagreement between the parties concerning the facts. Rather, their disagreement centers on the legal implications to be drawn from these facts.

The instant appeal is from the revocation by Walter J. Vincinelly,[1] DER's Commissioner of Deep Mine Safety, of the assistant mine foreman certificate of William V. Milesky.

Mr. Vincinelly's action was based upon a complaint filed by DER mine inspectors and a subsequent investigation. The charges and investigation arose from the accidental death of Mr. Wayne Travika on July 18, 1980. Mr. Travika was electrocuted when he came into contact with an energized trolley wire in the Mathies Mine where he was working as a general laborer.

This accident took place at approximately 6:15 a.m., i.e., during the midnight to 8:00 a.m. shift. Appellant was the shift foreman in charge of the entire Mathies Mine, a deep bituminous mine, on this shift.

When Mr. Milesky came on duty as the shift foreman on July 18, 1980, he faced several specific problems. The mine was experiencing some (apparently intermittant and localized) power outages. In addition, the roof of the mine was cracked and weakened in the area of an intersection in the mine adjacent to the back action switch in the West Mains of the Mathies Mine. One leg of the said intersection led to a room which housed the starter

---

1. Mr. Vincinelly is the individual to whom has been delegated DER's authority to revoke the certificates of assistant mine foremen.

box for the one south (coal conveyor) belt and it was in this room as well as in said intersection, that the roof was weak. The said roof condition had been noted prior to the midnight shift and the prior shift foreman had directed Rod North and William Koday, two laborers on his shift, to install cribs (6"x 6" x 20" blocks) and crossbars to support the roof. These workers had traveled to the intersection and had transported their cribs to this location with a track mounted supply car drawn by an electric locomotive. (The Mathies Mine contains some 75 miles of track as well as 75 miles of overhead trolley wires carrying 550 volt DC current for powering the locomotives which operate on said track).

A switch controlling power to the trolley wire leading into the intersection is located about 90 feet "outby" of the said intersection ("outby", being the opposite of, "inby" in mining parlance indicates the direction leaving the mine). This switch was in the off position when Messers. Koday and North arrived at this area and Mr. North turned the switch to the "on" position so that he could back the supply car in towards the intersection.[2] After the supply car was in place Mr. North walked back to the said electric switch and turned it "off" consistent with the general rule in the mine and the specific instructions he had received from Mr. Milesky during at least two recent weekly safety meetings.

North and Koday then climbed into the supply car, removed the cribs and began to construct the crib work support for the roof.

---

2. To reach the said intersection Koday and North had traveled outwards from the interior of the mine, via an adjacent tunnel, switched to another track at the West Mains back action switch and backed in towards the intersection through the tunnel in question.

When he came on duty Mr. Milesky was alerted about the weak roof and learned that Koday and North were being held over from the 4:00 p.m. to midnight shift to correct this unsafe condition. He instructed Mr. Daniel Bennett, a section foreman at the Mathies Mine, to inspect the area around the one south belt starter box and to cut the trolley near said intersection if, in his judgment, this wire posed a danger to the men working in this area or posed a danger of a mine fire in the event the sagging roof gave way.[3]

Mr. Bennett made an inspection of the said intersection and directed his mechanic to make sure the trolley switch was off and was tagged with a danger tag. He also told the mechanic to cut the trolley wire at both its inby and outby ends at the respective hangers nearest the said intersection and to remove the trolley wire from the intersection. Mr. Bennett later returned to the said intersection and determined that the trolley switch had been turned off and tagged and that the wire had been cut and removed as per his instructions.

By 3:00 a.m. on the morning of July 18, 1980, Messers. Koday and North had made progress, in constructing crib work at said intersection, however, they had not completed this task and they had already worked 3 hours of overtime. Thus, Mr. Milesky, who had arrived at the said intersection between 2:30 and 3:00 a.m.[4] released Koday and

3. The trolley wire ran through the intersection from the outby to the inby direction. By cutting and removing this wire in the intersection, the workers were provided with a path to the one south belt starter box from the supply car which did not pass under a trolley wire.

4. Mr. Milesky, upon arriving at the intersection had checked the trolley switch and found that it was cut off and tagged.

North and Mr. Milesky requested that general laborers, Wayne Travika and Angelo Sabatini, replace Koday and North and bring with them a new supply of cribs in a new supply car. Mr. Milesky discussed roof support measures with Travika and Sabatini but did not specifically instruct either of these persons to deenergize the said trolley switch; he left the intersection before they arrived.

When Travika and Sabatini arrived at the intersection, outby from the one south belt starter box intersection i.e., the place where the trolley switch was located, Mr. Sabatini turned this switch on. After North and Koday pulled out, Sabitini backed his supply car into approximately the same spot that North's car had occupied, i.e., some 10 feet from the said intersection on the outby side.

Mr. Sabatini had been instructed during recent weekly safety lectures not to leave the trolley power on, and he remembered these instructions, however he intentionally failed to turn off the trolley switch because he knew about the power failure problem in the mine and he wanted to leave the radio in the locomotive on so that he would know if the trolley power failed.[5] Mr. Sabatini never informed Mr. Milesky or any other supervisory personnel of this divergence from the mine rule.

Messers. Sabatini and Travika then took turns removing cribs from their supply car. In doing so each would occasionally step up into the car. Although there was some dispute as to the exact location of the trolley wire vis a vis the car, there is no doubt that it was close to a worker entering the car—perhaps at eye level when said worker was

5. He also wanted to have a quick means of escape (via the locomotive) in case the roof gave way or at least a means of signaling for help i.e., the radio.

standing on the mine floor and waist high when standing in the car and no more than six to eight inches away from said car to the wall (or outby) side of the car. Moreover, there is no doubt that the wire was not guarded by either permanent wooden guards or temporary plastic guards.

In spite of the proximity of the wire, however, Travika and Sabatini continued to unload cribs from their supply car for three hours without incident.

By approximately 6:00 a.m. all the cribs had been unloaded and the installation of the cribwork was almost complete. At this time Messers. Travika and Sabatini were joined by Mr. Milesky and a Mr. William Hamilton. All of these persons were working inside the one south belt starter box room completeing the cribwork. They had all the tools and material necessary to complete this task in the starter box room but, nevertheless, Mr. Travika, for reasons never to be explained, left the starter box, returned to the supply car, came into contact with the trolley wire and was electrocuted.

DER maintains that the conduct set forth above demonstrates that Mr. Milesky is in violation of the Pennsylvania Bituminous Coal Mine Act of July 17, 1961, P.L. 659, as amended, 52 P.S. § 701-101 et seq.

DER's complaint asserts that by failing and refusing to provide guarding on the trolley wire in the back action switch entry, and/or to specially instruct Messers. Sabatini and Travika to deenergize said trolley wire, Mr. Milesky evidenced an intentional and negligent disregard of the safety of persons in the Mathies Mine and of his responsibility to see that others comply with the said act.

DER has identified three alleged separate violations of the act arising from the above conduct; (1) failure to provide guarding for the trolley wire as

provided in Section 328 of the act; (2) directing and permitting persons under his supervision to work in an unsafe place and (3) failure to instruct persons working under his supervision as the procedures for working safely in the vicinity of a trolley wire.

A review of the act clearly demonstrates that the duties imposed upon assistant mine foreman are substantial. "When assistant mine foremen are employed, their duty shall be to assist the mine foreman in complying with the provisions of this act, and they shall be liable to the same penalties as the mine foreman for any violation of this act in parts or portions of the mine under their jurisdiction." The mine foreman, in turn, is responsible for seeing that the act is complied with; as provided by 52 P.S. §701-218:

"The mine foreman shall have full charge of all the inside workings and the persons employed therein, . . . in order that all the provisions of this act so far as they relate to this duties shall be complied with, and the regulations prescribed for each class of workmen under his charge carried out in the strictest manner possible." Section 279 of 52 P.S. §710-279 states, "It shall be the duty of the operator, superintendent, mine foreman, assistant mine foreman, mine examiners and other officials to comply with and to see that others comply with the provisions of this act." His duties also include seeing that the people under his supervision are working in a safe place, as provided by 52 P.S. §701-222a:

"The mine foreman or his assistant shall direct and see that every working place is properly secured and shall see that no person is directed or permitted to work in an unsafe place, unless it be for the purpose of making it safe." Section 252 of 52

P.S. §701-252 provides: "The officials in charge shall examine for unsafe conditions, the roof, faces, ribs, and timbers or supports of all working places each time they visit a place. Unsafe conditions found by them shall be corrected promptly."

Section 328 of 52 P.S. §701-328, the section specifically relating to "guarding", reads as follows:

"At all landings and partings or other places where men are required to regularly work or pass under trolley or other bare power wires, which are placed less than six and one-half feet above top of rail, a suitable protection shall be provided. This protection shall consist of placing boards along the wire, which boards shall not be more than five inches apart, nor less than two inches below the lowest point of the wire: Provided, That the distance between boards on curves may exceed five inches, but shall not exceed eight inches. This does not prohibit the use of other approved devices or methods furnishing equal or better protection."

As to the count based upon section 328 of the act there is no doubt that the portion of the trolley wire in question was not protected with boards. Neither, was it protected by plastic shielding which was apparently adopted by the Mathies Mine after July 18, 1980 for providing temporary shielding of trolley wires.

On the other hand, there are approximately 75 miles of trolley wire in the Mathies Mine and in this mine (as in all other mines) the vast majority of this wire is not shielded. Thus, DER, tacitly agrees with appellant that bare wire is the standard in the industry and that "suitable protection" need only be provided in those instances where men are required to work or pass under trolley wire. Milesky suggests that the portion of trolley wire in question

was not a place where men *regularly* worked and, of course, this is correct. Men were working at this location (apparently only for 2 shifts) solely to correct an unsafe roof (and thus, incidentally, to comply with sections 222a and 252 of the act). We do not accept, however, Milesky's narrow interpretation of section 328. This section and indeed the entire act, must be liberally construed to achieve the salutory purpose of the act; miner safety. Thus, we hold that even where men are temporarily or intermittently required to work under a bare trolley wire which is within six and one-half feet above the top of the trolley rail (as it was here), "suitable protection shall be provided".

On the question of what constitutes suitable protection, however, Mr. Milesky's argument is more convincing. He argues that severing and physically removing part of the trolley wire from the intersection and turning off and tagging the switch which controlled power to the line in question was an even more effective means of insuring worker safety adjacent to this wire than merely providing a plastic or wooden shield (which still would allow contact with the hot wire through the opening between the shields). This theory not only appeals to our common sense; it was ratified by DER's mine inspector Robert Fulton who stated that had the wire in question been deenergized it would not have been a violation of section 328.

There is no controversy in this case that Mr. Milesky gave orders to Mr. Bennett to deenergize the wire in question, that Mr. Bennett instructed his mechanic to deenergize the said wire or that this wire had been deenergized and the switch controlling the power to this wire had been turned off and tagged. Indeed, DER does not challenge the testimony of Messers. Milesky and Bennett that

each man (at around 3:00 a.m. and prior to that, respectively) separately checked to see that Mr. Milesky's instructions had been carried out and each determined that the switch in question had been turned off and tagged.

But for Mr. Sabatini's failure to turn off the switch after he backed in the supply car, it is obvious that the trolley wire would have been sufficiently guarded and the working area near the one south belt starter box would have been safe, i.e., there would be no basis for counts 1 and 2 of DER's complaint. Therefore the issue here is whether Mr. Milesky had a duty to specially instruct or check up on Mr. Sabatini. In other words, Mr. Milesky's fault must reside, if anywhere, in his admitted failure to specifically instruct Messers. Travika and Sabatini on July 18, 1980 to turn off the said switch and/or in his admitted failure to personally inspect the power switch at around 6:00 a.m. when he returned to one south belt starter box.

The parties have not directed our attention to any standard by which to gauge Mr. Milesky's conduct but DER did use the term "negligence" in its complaint. Thus, it would seem that the ancient but honorable "reasonable man" standard should be applied.[6]

Applying this standard to the instant matter we do not find that Mr. Milesky's failures rise to the level of negligence. We think that Mr. Milesky had reason to anticipate that Messers. Sabatini and Travika would deenergize the trolley wire after moving their supply car into place. They had both

---

6. Of course, the reasonable man in question must be the reasonable assistant mine foreman, a person intimately familiar with conditions and dangers in the mine.

received safety training (as recently as one month prior to July 18, 1980) from Mr. Milesky to this effect. And Mr. Sabatini testified that he remembered this training and knew that he was supposed to deenergize the line in question. Moreover, as Mr. Milesky knew from personal observation, the switch for this trolley line had been tagged with a danger warning tag and this switch was in the "off" position when Messers. Sabatini and Travika arrived at this area.

As Dean Prosser notes in his classic dissertation on the reasonable man there are situations " . . . in which the hypothetical reasonable man would be expected to anticipate and guard against the conduct of others . . . [this duty] . . . becomes most obvious when the actor has reason to know that he is dealing with persons whose characteristics make it especially likely that they will do unreasonable things" Prosser, Law of Torts §33. Here, of course, the workers in question were extremely *unlikely* to leave the power switch on due to their recent instructions and experience in the mine.

To complete the tort analogy, assuming, arguendo, that Mr. Milesky was negligent in failing to specially instruct Messers. Sabatini and Travika to cut off the power switch, this negligence was not the proximate cause of Travika's electrocution. Rather, it was Mr. Sabatini who turned on the power and failed to turn it off. Thus, Mr. Sabatini's act was an "intervening force" as that is defined in the Restatement, 2d Torts, §441 as [a]n intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed."

Similaly, the late Mr. Travika had also received safety training; he, too, knew about the necessity to deenergize the said trolley wire. Thus, if he knew

that Sabatini had left the switch on, yet did not insist that this wire be deenergized and he failed to exercise extreme caution when working near a "hot" wire, it is possible that Mr. Travika's negligence contributed to his demise.

The above concepts are not presented to exonerate Mr. Milesky. It is possible that a mine foreman could utilize the above concepts to avoid a civil action yet could be properly decertified by DER. Nevertheless, the above concepts represent the product of hundreds of years of legal reasoning applied to unfortunate situations and they do help to emphasize the extremely limited extent of Mr. Milesky's fault in the instant matter.

In conclusion, the board agrees with appellant that:

"The Appellant did everything in his power to ensure that a safe condition was provided in an unsafe situation in which his men had to work. He was faced with an emergency situation on several fronts and still found the time to ensure that a trolley wire, which could provide possible harm to his men, was guarded in the best possible way; that is de-energized, tagged, and removed from any area in which they would have to pass directly underneath the same. He ordered this to be done and inspected that it was done before going on to his other duties. He had instructed his men in how to perform in such a situation and could only expect them to do so. That Wayne Travika died is indeed a tragedy. But to place blame on the Appellant, based on the facts and the testimony presented to this Board and to allow the Appellant to be decertified as an assistant mine foreman for breaching his duties as to the safety of his men, is to compound the tragedy."

## CONCLUSIONS OF LAW

1. The board has jurisdiction over the subject matter and the parties.

2. The department, under the Act of June 3, 1943, P.L. 848, as amended, 52 P.S. §11 et seq., is authorized to revoke the certificate of an assistant mine foreman who fails to perform duties imposed by law or interferes in the safe and lawful operation of a mine.

3. The department, as part of its power to issue certificates, is authorized to revoke the certificate of a person demonstrating either an inability or unwillingness to perform the duties of persons holding the certificate.

4. Appellant did not violate any duties under the above act, did not indicate any unwillingness or inability to perform those duties and did not interfere with the safe and lawful opeation of the Mathies Mine; consequently DER's revocation of appellant's assistant mine foreman certificate was not authorized by law but rather was arbitrary and capricious.

## ORDER

And now, this August 26, 1981 appellant's appeal is sustained and DER's revocation of appellant's assistant mine foreman certificate is set aside and said certificate is reinstated.